**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

---

MXENERGY INC., and MXENERGY
ELECTRIC, INC.,

                                  Plaintiffs,

               -vs-                       DECISION and ORDER
                                            06-CV-6025 CJS

ROCHESTER GAS & ELECTRIC
CORPORATION,

                                  Defendant.

---

**APPEARANCES**

For plaintiffs:                           Richard Schoenstein, Esq.
                                         Thomas J. Finn, Esq.
                                         Paul, Hastings, Janofsky & Walker LLP
                                         75 East 55th Street
                                         New York, NY 10022
                                         (212) 318-6000

                                         Thomas W. Hartmann, Esq.
                                         General Counsel
                                         MX Energy
                                         595 Summer Street Suite 300
                                         Stamford, CT 06901-1407

For Defendants:                        Thomas Reidy, Esq.
                                         Thomas S. D'Antonio, Esq.
                                         Ward, Norris, Heller & Reidy
                                         300 State St.
                                         Rochester, NY 14614
                                         (585) 454-0700

## INTRODUCTION

**Siragusa, J.** This diversity case is before the Court on plaintiffs' motion for a preliminary injunction. Previously, the Court issued a temporary restraining order ("TRO"), and then replaced it with a modified TRO, after which the parties engaged unsuccessfully in mediation. In connection with the preliminary injunction application, the parties completed limited, expedited discovery, and on March 6, 2006, the Court heard oral argument. The Court now makes the following findings of fact and conclusions of law, based upon which, it issues the preliminary injunction detailed below.[1]

## FINDINGS OF FACT

Each plaintiff (collectively referred to herein as "MxEnergy") is an Energy Supply Company ("ESCO"), incorporated in Delaware, with its principal place of business in Connecticut. Defendant Rochester Gas and Electric Corporation ("RG&E"), is a distribution utility, selling natural gas and electricity, incorporated in New York with its principal place of business in Rochester, New York.[2] The New York State Public Service Commission ("PSC") qualified MxEnergy as an ESCO authorized to solicit business in the Rochester area in direct competition with RG&E. As an energy distribution utility, RG&E is obligated to distribute natural gas and electricity sold by MxEnergy to customers in its territory. Currently, MxEnergy has about one-and-one-half percent of the market share in the area serviced by RG&E.

---

[1] In reaching its decision, the Court did not consider the affidavit of Kathryn Tozzini, with attached exhibits, filed on March 8, 2006 (# 34).

[2] New York State Electric and Gas ("NYSEG"), referred to in the Court's TRO, is an affiliate of RG&E.

The parties entered into Operating Agreements ("Agreements"), which, by their terms, incorporated a ruling from the PSC. This ruling, commonly referred to as the UBP[3], details the procedure required to be used by RG&E to seek discontinuance of MxEnergy as an ESCO. In that respect, section 2(F)(2) of the UBP states:

> To initiate the discontinuance process, a distribution utility shall send a non-EDI[4] discontinuance notice by overnight mail and verified receipt, to the ESCO or Direct Customer and DPS.[5] The notice shall contain the following information:
>
> a. the reason, cure period, if any, and effective date for the discontinuance;
>
> b. a statement that the distribution utility shall notify the ESCO's customers of the discontinuance if the ESCO fails to correct the deficiency described in the notice within the cure period, unless the DPS directs the distribution utility to stop the discontinuance process;
>
> c. the distribution utility may suspend the ESCO's right to enroll customers until correction of the deficiency; and
>
> d. correction of the deficiency within the cure period, or a DPS directive, will end the discontinuance process.

UBP section 2(F)(2). Additionally, section 2(F)(7)(f) states:

> Upon a distribution utility determination that an ESCO or Direct Customer failed, except in force majeure conditions, to comply with any other applicable provision of the distribution utility's … operating agreement, … the distribution utility may initiate a discontinuance process no sooner than ten

---

[3] *See In re: Retail Access Business Rules*, No. 98-M-1343 (N.Y. Public Service Commission Aug. 2, 2004), Appendix A (Uniform Business Practices).

[4] EDI is defined in Section 1 as, "Electronic data interchange (EDI) – The computer-to-computer exchange of routine information in a standard format using established data processing protocols. EDI transactions are used in retail access programs to switch customers from one supplier to another or to exchange customers' history, usage or billing data between a distribution utility or MDSP and an ESCO."

[5] "Department of Public Service." *See* Appendix A, section 2A.

> business days (cure period) after receipt by the ESCO … of a discontinuance notice. If the ESCO … provides adequate assurances and a description of any necessary process changes that ensure compliance on or before the expiration of the cure period, the distribution utility shall stop the discontinuance process. Upon a determination to continue the discontinuance process because the assurances and proposed process changes are inadequate, the distribution utility shall notify the ESCO … that it will discontinue participation no later than 15 business days from the expiration of the cure period. The distribution utility shall notify the ESCO's customers that it will discontinue participation on or before the expiration of 15 business days after the end of the cure period.

UBP section 2(F)(7)(f). Moreover, section 25 of the Agreements, reads in pertinent part as follows:

> This Agreement and the Contract Documents are not intended, and shall not be construed, to create any association, joint venture, agency relationship or partnership between the Parties or to impose any such obligation or liability upon either Party. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, or act on behalf of, of to act as or be an agent or representative of, or otherwise, bind the other Party.

(Agreements § 25.)

MxEnergy utilized telemarketing and door-to-door sales to solicit business in the area serviced by RG&E. Prior to October 29, 2005, upon receiving complaints about MxEnergy through its call center, RG&E would forward such complaints directly to MxEnergy, which would resolve the problem and report the resolution back to RG&E. However, on October 29, 2005, it came to RG&E's attention that an agent of plaintiff's door-to-door marketing firm had appeared at RG&E's offices asking for RG&E brochures which described the company's "Voice Your Choice" program. The door-to-door solicitor stated to the RG&E receptionist to whom he spoke the following: that the brochures were required to show RG&E utility customers that they needed to choose an alternate energy supplier by the end of 2005; that if they did not, the government would choose one for

them; and that RG&E no longer wanted to be an energy supplier. It is undisputed that all these statements were untrue. Then, the following day, RG&E received a telephone call from the Rochester Police Department asking about the same MxEnergy door-to-door solicitor. The police department indicated to RG&E that such individual had represented himself to be an RG&E employee, and that he was wearing an identity badge falsely proclaiming, "Rochester Gas & Electric Authorized Energy Supply Sales Agent." (Letter from Jeffrey R. Clark, RG&E Secretary and Managing Attorney to Robert A. Colon, Assistant Attorney General in Charge, Rochester (Dec. 20, 2006), at 2.) However, rather than immediately notifying MxEnergy of the complaint, as it had previously done in the past, or, for that matter, informing the Department of Public Service ("DPS"), RG&E delayed disclosure for a 52-day period, to conduct its own investigation into the extent of any similar activity on the part of other door-to-door solicitors for MxEnergy. In that regard, on December 20, 2005, RG&E's Secretary and General Counsel sent a letter to the New York State Attorney General's Office in Rochester[6] accusing MxEnergy of engaging in deceptive marketing practices and violating state law. At the same time, RG&E issued a press release with the headline, "RG&E Warns Customers to Beware and Ask for Identification," in which it informed the press that employees or agents of MxEnergy falsely represented themselves as RG&E energy supply sales agents.

---

[6]On that same date, December 20, 2005, RG&E also notified the New York Department of Public Service of their complaint to the Attorney General. On February 17, 2006, the DPS issued what it entitled "Staff Report on the Dispute Between MxEnergy, Inc./MxElectric, Inc. and New York State Electric & Gas Corp. and Rochester Gas & Electric Corp." In its report, the DPS analyzed the claims of the parties, was critical of both, and issued recommendations for MxEnergy and RG&E "to respond to RG&E's allegations and ensure that events of this nature do not recur." (Staff Report at 10.). A hearing before an administrative judge is scheduled for mid-May 2006. Following that hearing, the DPS will issue a decision either discontinuing MxEnergy as an ESCO in RG&E's territory, or permitting it to continue.

On January 6, 2006, RG&E's general counsel sent a letter to MxEnergy stating that RG&E was invoking the provisions of the UBP, specifically 2(F)(2)(c), to suspend MxEnergy from enrolling new gas and electric customers, pending the results of investigations by the New York Attorney General and DPS. This had the effect of halting the transfer of new customers from their previous energy supplier to MxEnergy. Additionally, RG&E's call center answered inquiries about MxEnergy by indicating that it could no longer do business in the territory. MxEnergy commenced this lawsuit on January 13, 2006, and sought a temporary restraining order.

## CONCLUSIONS OF LAW

The standard for granting a preliminary injunction is well settled. It requires the moving party to show that: (a) it will suffer irreparable harm in the absence of an injunction; and (b) either (i) a likelihood of success on the merits, or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Tom Doherty Assoc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995). RG&E argues that the stricter standard of likelihood of success on the merits is required here since the injunction being sought by MxEnergy seeks to alter the status quo. On this point, RG&E maintains that the "status quo" is defined by the parties' relationship as of January 6, 2006, the day RG&E "suspended" MxEnergy. The Court disagrees. "The status quo has been frequently defined as the last uncontested status which preceded the pending controversy." *Flood v. Kuhn*, 309 F. Supp. 793, 798 (S.D.N.Y.1970), *aff'd*, 443 F.2d 264 (2 Cir. 1971), *aff'd*, 407 U.S. 258 (1972). Here, the status quo in this case must be determined as of January 5, 2006, the last day

before RG&E altered the relationship between the parties by "suspending" MxEnergy enrollments. Consequently, the Court concludes that the "sufficiently serious question" standard is applicable here. *See Tom Doherty Assoc.*, 60 F.3d at 33-34 (higher standard of "likelihood of success on the merits" applies to injunction which seeks to alter the status quo).

Under the "sufficiently serious question" standard applicable here, the Court determines first that there are sufficiently serious questions going to the merits to make them a fair ground of litigation. In this regard, the parties, in support of their respective positions, rely on the provisions of the UBP incorporated into the Agreements. The Court concludes that these provisions of the UBP, detailed in the Court's findings of fact above, are ambiguous. Specifically the Court notes that UBP section 2(F)(7)(f) dictates that the disestablishment process cannot be commenced until ten business days after the receipt of a disestablishment notice. Section 2(F)(2), however, states that the disestablishment process is started by the sending of a disestablishment notice, which must contain certain information, including that, "the distribution utility may suspend the ESCO's right to enroll customers until correction of the deficiency…." (UBP sec. 2(F)(2)(c).) Since the UBP is central to the dispute between the parties, and its disestablishment provisions present a fair issue for litigation, MxEnergy has met this requirement for a preliminary injunction.

The Court next turns to the balance of hardships. In considering this factor, RG&E contends that the Court must consider the public interest and MxEnergy's lack of clean hands. More specifically, RG&E maintains that the public interest weighs against granting the injunction because MxEnergy is, in fact, guilty of misleading the public. Additionally, RG&E argues that MxEnergy cannot avail itself of an equitable remedy, since it lacks clean

hands. As to the public interest, MxEnergy counters that the public is best served by a competitive market, which will be significantly reduced if it is precluded from enrolling new customers. With respect to clean hands, MxEnergy points out that prior to October 29, 2005, each time RG&E brought a concern to its attention, it expeditiously resolved it. Moreover, MxEnergy points out that denial of the preliminary injunction would detrimentally impact all their marketing efforts to date and adversely affect their ability to offer energy consumers a choice in this area. The Court finds MxEnergy's position meritorious and concludes that the balance of hardships tips decidedly in favor of MxEnergy.

Finally, the Court determines that MxEnergy has met its burden of showing irreparable harm. The Court agrees with MxEnergy's argument that since the harm here involves not only the potential loss of future sales, but damage to its reputation that would result from its inability to enroll customers, money damages would be insufficient.

During oral argument, counsel for MxEnergy offered to stop all door-to-door solicitations until June 6, 2006. It is clear to the Court that MxEnergy's door-to-door marketing was the most flagrant source of the fraud alleged in this case and is incapable of adequate monitoring. On the other hand, MxEnergy's telemarketing is subject to third-party verification, which serves to discourage misrepresentations, and further, MxEnergy's telemarketing can be closely monitored by tape recordings.

## INJUNCTIVE RELIEF

Accordingly, the Court issues the following preliminary injunction. It is hereby

ORDERED, that RG&E's and NYSEG's customer call centers shall not make any comment with respect to MxEnergy or answer any question concerning MxEnergy, other

than to tell the caller that he or she should contact MxEnergy directly at (800) 785-4373; and it is further

ORDERED, RG&E and NYSEG shall enroll all customers who have chosen to purchase their supply of electricity, or natural gas, or both, from MxEnergy as evidenced by a written contract, a TPV, or Internet enrollment; and it is further

ORDERED, that RG&E and NYSEG shall continue to maintain Web links and listings to MxEnergy on their Web sites, as those Web links and listings existed prior to January 6, 2006; and it is further

ORDERED, that MxEnergy's undertaking shall continue to be fixed in the sum of $10,000, which sum shall remain on deposit with the Court; and it is further

ORDERED, that this preliminary injunction shall replace the TRO now in effect as of Tuesday, March 14, 2006, at 9:00 A.M.; and it is further

ORDERED, that this preliminary injunction shall be vacated in the event that the DPS disestablishes MxEnergy as an ESCO in RG&E's territory.

It is So Ordered.

DATED: March 10, 2006
          Rochester, New York

                  ENTER:

                          /s/ Charles J. Siragusa
                          CHARLES J. SIRAGUSA
                          United States District Judge